"UNDER SEAL"

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

**F I L E D**
ASHEVILLE, N. C.

JUN - 6 2005

U.S. DISTRICT COURT
W. DIST. OF N. C.

| | |
|---|---|
| UNITED STATES OF AMERICA ) | DOCKET NO. 1: 05 CR 209 |
| ) | |
| v. ) | |
| ) | |
| 1) RAPHAEL ARROYOS FERNANDEZ ) | |
| a/k/a Raphael Fernando Fernandez ) | **BILL OF INDICTMENT** |
| 2) ARMIDA ARRAGON ARROYOS ) | |
| 3) PEUJON DESLIN NAZIFI ) | |
| a/k/a "P.J." ) | |
| 4) AHMAD NAZIFI ) | |
| _____ ) | Violations: |

Violations:
21 USC § 841
21 USC § 846
18 USC § 1956(h)

THE GRAND JURY CHARGES:

INTRODUCTORY PARAGRAPHS

1. Armida Arroyos is the biological mother of Raphael Arroyos Fernandez and Philip Arroyos Cortez. Ahmad Nazifi is the biological father of Peujon Deslin Nazifi. Raphael Arroyos Fernandez and Peujon Deslin Nazifi ("P.J.") have been engaged in a romantic relationship for the period of the conspiracy. All were, during the conspiracy, residents of Arizona.

2. In January 2004, the Asheville, North Carolina office of the Drug Enforcement Administration (DEA) was contacted by agents assigned to the Tucson, Arizona DEA office regarding the transportation of cocaine and marijuana from Tucson, Arizona to Asheville, North Carolina. A confidential source of information contacted a Tucson DEA agent to whom he had previously provided information, and related that Clifford Vance Cast, a licensed pilot and certified flight instructor, was assisting a group of Hispanics in smuggling cocaine and marijuana via aircraft from Tucson, Arizona to Asheville, North Carolina.

Page 1 of 8

Case 1:05-cr-00209-MR-DLH   Document 3   Filed 06/06/05   Page 1 of 8

3.    DEA Tucson contacted the El Paso Intelligence Center (EPIC) air watch group and requested that the Piper Malibu be tracked, via transponder, on any future flights. On February 10, 2004 EPIC communicated with DEA Asheville that Cast had filed a flight plan for Tucson, Arizona to Asheville, North Carolina. DEA Asheville then arranged surveillance of the Asheville Regional Jet Center. At approximately 11:17 a.m., the Piper Malibu operated by Cast landed at the Asheville, NC airport. Cast and two Hispanic males (later identified as indicted co-conspirators Juan Prieto, a/k/a Alfredo Noriega-Leyva and Luis Gonzalez) deplaned and removed 4 pieces of luggage, which was later learned contained 15 kilograms of cocaine and approximately 50 pounds of marijuana, from the aircraft. The three then drove to downtown Asheville and rented rooms at the Springhill Suites Hotel and the Courtyard/Marriott Hotel (these hotels are located in the same complex along with the Hampton Inn Suites). Cast then departed and returned to the Asheville airport.

4.    Agents continued surveillance in and around the hotels. Through surveillance, officers witnessed transfers between Prieto and other co-defendants. Following delivery of 8 kilograms of cocaine to various couriers/distributors in Asheville, North Carolina, agents arrested Prieto, Luis Gonzalez, Bustillo, Lear, Arroyo-Resendiz, Santos, and Ismael Gonzalez. Bustillo, Arroyo-Resendiz and Santos-Gonzalez were couriers working for Hernandez-Ramos in Asheville. Lear also worked under Hernandez-Ramos as a courier and small distributor. The arrest of seven defendants was made and through later debriefings identified the members of the conspiracy.

5.    Meza-Moreno, a resident of Tucson, Arizona during the conspiracy, met Isidro Hernandez-Ramos (a resident of Asheville, North Carolina and later a primary distributor in Asheville, North Carolina) while in jail in Sonora-Nogales, Mexico in 2001 and early 2002. Meza-Moreno and Ramos determined that it would be profitable for Meza-Moreno to transport cocaine and marijuana from Tucson, Arizona to Ramos in Asheville, North Carolina where Hernandez-Ramos would then distribute the narcotics in Western North Carolina.

6.    By the end of summer 2003, Meza-Moreno had introduced Francisco Gonzalez Castro and Rafael Fernandez to Hernandez-Ramos. Castro and Fernandez were residents of Tucson, Arizona from whom Meza-Moreno, prior to 2003, had

Case 1:05-cr-00209-MR-DLH   Document 3   Filed 06/06/05   Page 2 of 8

procured cocaine. Castro and Fernandez visited Asheville and began to establish a firm connection with Hernandez-Ramos and many of Hernandez-Ramos' customers. They rented a home in the area from which they could base their Asheville distribution network. Jose Topete was an associate of Fernandez who knew Clifford Cast, a licensed pilot. When Meza-Moreno determined that the cocaine should be transported in a way other than by tractor trailer, Topete introduced Clifford Cast to the organization. Cast was to be paid based upon the volume of cocaine or marijuana that he transported for the organization. Cast made his first flight to Asheville, North Carolina in late August or early September of 2003. In addition to smuggling narcotics from Tucson to Asheville, Cast smuggled money, via aircraft, from Asheville, North Carolina back to Fernandez and Castro in Tucson, Arizona.

7.     Castro and Fernandez made numerous trips to Asheville generally flying commercial airlines while using Cast to smuggle drugs to Asheville and currency back to Tucson via his aircraft. This continued until January 2004 when Fernandez was incarcerated in the Pima County jail in Tucson, Arizona on unrelated charges. He remained in custody yet continued to act as a leader/organizer through his telephone conversations with and jailhouse visits from Castro, his mother Armida Arroyos and his girlfriend, Peujon Deslin Nazifi.

8.     In March 2004 Cast made another delivery to Asheville whereupon he was arrested. On March 10 Isidro Hernandez-Ramos was arrested and he began cooperating. Ramirez-Ramos detailed his supply connection from Meza-Moreno, Fernandez and Castro as well as his use of Bustillo, Lear, Arroyo-Resendiz and Santos-Gonzalez as couriers/minor distributors.

9.     Meza-Moreno smuggled approximately 53 kilograms of cocaine into Asheville, North Carolina the last week-end of January 2004. According to Prieto, on or about January 30 or 31st, Castro and Fernandez (via telephone conversation from Fernandez in the Pima County, Arizona jail) discussed their dissatisfaction with Meza-Moreno resulting from his frequent use of Cast and the aircraft, as well as the fact that Meza-Moreno was still actively involved in the Asheville narcotic distribution business. Apparently Meza-Moreno, Castro and Fernandez previously agreed that Meza-Moreno would develop business elsewhere while Castro and Fernandez continued to supply and distribute cocaine within Asheville.

Page 3 of 8

Meza-Moreno however, as evidenced by the 53 kilograms of cocaine delivered the last week of January, was still utilizing the aircraft and distributing within Asheville.

10. The Pima County, Arizona jail records inmate telephone calls. Those calls are maintained within the communications facility. Inmate calls are tracked by personal identification numbers (PIN). Rafael Fernandez often would pay other inmates for the use of their PIN numbers in an attempt to prevent his conversations from being traced back to him. Most of his conversations used "code" language in a further attempt to protect the contents of the conversations.

11. On or about January 31, 2004, Rafael Fernandez contacted Peujon Deslin Nazifi, via telephone, from the Pima County jail. Fernandez directed Nazifi to call "Manny" (Francisco Castro). During that conversation, Fernandez and Castro discussed their narcotic distribution business -- most specifically their distrust of Meza-Moreno ("Chuy"). Fernandez directed Castro to "keep an eye on his mother (Armida Arroyos), give her "a dollar a month and pay for the bills on top of that". Castro agreed. Castro warned that when he got back (from Asheville, NC) that "he would be busy for a couple of days taking care of the [Chuy] problem." Fernandez directed Castro to "tell someone where everything is just in case something happens."

12. On or about February 1, 2004 Meza-Moreno returned to Tucson, Arizona from Asheville, North Carolina and as arranged by Castro, met with Prieto and Castro to receive drug proceeds in the amount of approximately $180,000. Meza-Moreno was never seen by friends or family following his meeting with Castro. On or about February 23, 2004, the dismembered body of Meza-Moreno was located in the desert outside of Tucson, Arizona. Castro was convicted of the murder of Jesus Meza-Moreno.

13. Peujon Deslin Nazifi's Wells Fargo Bank Account had regular large cash deposits.

14. Peujon Deslin Nazifi's Wells Fargo ATM/credit card reflects numerous purchases in Asheville, North Carolina. Armida Arragon Arroyos' Bank of America ATM/credit card was used in Asheville, North Carolina as well, to include payment for a hotel room.

Case 1:05-cr-00209-MR-DLH   Document 3   Filed 06/06/05   Page 4 of 8

15.   During recorded phone conversations from the Pima County jail, Raphael Fernandez and Peujon Nazifi discussed the purchase of a $500,000 house. Subsequently, Peujon Nazifi detailed for Fernandez her meetings with real estate agents relative to the purchase of a house.

16.   Ahmad Nazifi purchased a 2003 black Mercedes Benz 500E automobile on 2/23/04. Nazifi maintained a bank account at Bank of America. Just prior to the scheduled payments on the 2003 Mercedes automobile, cash deposits were made into Nazifi's bank accounts. Most of these deposits were made with "counter" deposit slips (not pre-printed ones issued to the account). Checks for the car payment were then issued from Ahmad Nazifi's checking account with notations on the memo section of the check such as "Merz/Bens/PJ", "PJ/MB", "MersBens/PJ".

17.   Numerous co-conspirators, in their statements to agents, described Rafael Fernandez as operating a black Mercedes Benz 500. Fernandez was operating the black Mercedes allegedly owned by Ahmad Nazifi when he was arrested in January 2004 in Tucson, Arizona.

18.   In recorded jail conversations between Peujon Nazifi and Rafael Fernandez, they discussed using bank safety deposit boxes to hide money. Following these conversations, bank records show that Ahmad Nazifi had a safe deposit box opened at about the same time as another safe deposit box was opened for Francisco Castro's father.

19.   Armida Arragon Arroyos maintained a deposit account at Bank of America. Generally, between May 2003 and March 2004, cash deposits in excess of $1000 were made into her account bi-weekly.

20.   On March 1, 2004, a cash deposit in the amount of $9000 was made into Armida Arroyos' Bank of America account. This transaction occurred in Asheville, NC. The duplicate deposit slip for this deposit was located in the wallet of Francisco Castro when he was arrested in Tucson, Arizona on March 31, 2004. On this same date, within three minutes of the deposit in Arroyos' account, a deposit in the amount of $6000 was made into the account of Francisco Castro.

Case 1:05-cr-00209-MR-DLH   Document 3   Filed 06/06/05   Page 5 of 8

21.    In or around March 2004, Armida Arroyos refinanced her residence at 2442 S. Edmonson Avenue, Tucson, Arizona. On the signed loan application, Arroyos listed herself as a self-employed taxi driver for 6 years with a gross income of $8000. To support this contention, several letters of "reference" were submitted with the application. One of the attached letters was from Peujon Deslin Nazifi who alleged that "Armida Arroyo has been my daily driver for the past 4 years. She takes care of all my transportation needs, due to the fact that I cannot drive a vehicle." Peujon Nazifi has an Arizona Driver's license number B14401547.

## COUNT ONE

Introductory paragraphs one through 21 are re-alleged and incorporated herein by reference.

From in or around January 2002 and continuing until in or around March 2004, in Buncombe County, which is within the Western District of North Carolina, and elsewhere,

**1) RAPHAEL ARROYOS FERNANDEZ**
**a/k/a "Raphael Fernando Fernandez"**
**3) PEUJON DESLIN NAZIFI**
**a/k/a "P.J."**

did knowingly and intentionally combine, conspire, confederate and agree with Phillip Arroyos Cortez, Francisco Gonzalez Castro, a/k/a "Manny", a/k/a "Frankie", Ivan Gerardo Bustillo, Clifford Vance Cast, Luis Gonzalez, Ismael Santos Gonzalez a/k/a Hector Garcia Torres, Kenneth Shane Lear, Juan Prieto, Jr. a/k/a Alfredo Leyva-Noriega, Isidro Hernandez-Ramos, Jaime Arroyo Resendiz, Eric Alex Barcello, Noah Assad Tajlili, Jose Jacobo Topete, and others, both known and unknown to the Grand Jury, to possess with intent to distribute cocaine, a schedule II controlled substance and marijuana, a schedule I controlled substance.

1.    Said conspiracy involved at least 5 kilograms of a mixture or substance containing a detectable amount of cocaine;

2.    Said conspiracy involved less than 50 kilograms of a mixture or substance containing a detectable amount of marijuana;

All in violation of Title 21, United States Code, Sections 841 and 846.

Page 6 of 8

## COUNT TWO

Introductory paragraphs one through 21 are re-alleged and incorporated herein by reference.

From in or around January 2002 and continuing until in or around March 2004, in Buncombe County, which is within the Western District of North Carolina, and elsewhere,

**1) RAPHAEL ARROYOS FERNANDEZ**
a/k/a Raphael Fernando Fernandez
**2) ARMIDA ARRAGON ARROYOS**
**3) PEUJON DESLIN NAZIFI**
**4) AHMAD NAZIFI**

and others both known and unknown to the Grand Jury, did combine, conspire, confederate and agree with each other, and others known and unknown to the Grand Jury, to commit certain offenses against the United States as follows:

a.    Knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, to conduct and attempt to conduct such a financial transaction with the intent to promote the carrying on of specified unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); and,

b.    Knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, to conduct and attempt to conduct such a financial transaction knowing that the transaction was designed in whole or in part to conceal and disguise the nature, the location , the source, the ownership and the control of the proceeds of specified unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and,

c.    Knowingly to engage in monetary transactions in criminally derived property that was of a value greater than $10,000, in violation of Title 18, United States Code, Section 1957.

All in violation of Title 18, United States Code, Section 1956(h).


## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of the provisions of 21 U.S.C. §853. The defendant has or had a possessory or legal interest in the following property that is subject to forfeiture in accordance with §853:

(a) all property constituting, or derived from, any proceeds the defendant obtained, directly or indirectly, as a result of the violations alleged in this bill of indictment;

(b) all property used or intended to be used, in any manner or part, to commit or to facilitate the commission of such violations; and,

(c) in the event that any property described in (a) or (b) cannot be located or recovered or has been substantially diminished in value or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant, to the extent of the value of the property described in (a) and (b).

The grand jury finds probable cause to believe that the following property is subject to forfeiture on one or more of the grounds stated above:

1. All currency and monetary instruments which were received during, involved in or used or intended to be used to facilitate the crimes alleged in this bill of indictment, including but not limited to the following:

    a. the sum of approximately $ 500,000 in proceeds;

2. Real property located at 9392 East Grapevine Spring Place, Tucson, Arizona;

3. 2003 Mercedes Benz 500E VIN WDBUF70J23A112541.


**A TRUE BILL:**

_Holly B. McColl_
GRAND JURY FOREMAN


GRETCHEN C.F. SHAPPERT
UNITED STATES ATTORNEY

_Jill Westmoreland Rose_
JILL WESTMORELAND ROSE
ASSISTANT U.S. ATTORNEY

Case 1:05-cr-00209-MR-DLH   Document 3   Filed 06/06/05   Page 8 of 8